I am compelled to decide this case against what seems to me to be the truth of it. The rule that neither the husband *Page 213 
nor the wife is allowed to testify that a child born to the wife during marriage is not the child of the marriage, as stated by Lord Mansfield in Goodright v. Moss, 2 Cowp. 591, is invoked by the wife.
Vice-Chancellor Howell, in Palmer v. Palmer (1912),79 N.J. Eq. 496, a nullity suit, examined the English and American cases on this head, and came to the conclusion that the later English decisions were to such effect that they permitted proof by the husband and the wife of the illegitimacy of the child, but that in this country the old rule seemed to prevail, which old rule, because of the liberalizing of the later English cases, as he found them, he chose to characterize as "the American rule;" and he added that this American rule, so called, was, in his judgment, the more reasonable one. So he held in the case before him that it was not competent for the husband to testify as a witness to prove the illegitimacy of the child in question. He noted the fact that the rule had not been passed upon by our court of errors and appeals, although it was once mentioned by that court in Wallace v. Wallace (1907), 73 N.J. Eq. 403,
a divorce suit, where Mr. Justice Swayze said, and this is the whole opinion:
"We think the decree should be affirmed, for the reasons given by the learned vice-chancellor; but in affirming the decree it is not necessary to hold that the testimony of the husband was admissible to prove non-access to his wife. No objection was made to the reception of his testimony, but we desire to leave undecided the questions whether our Evidence act makes the testimony competent as against an objection, and whether public policy permits the objection to the testimony, if valid, to be waived by the adverse party."
In this case of Wallace v. Wallace, Vice-Chancellor Bergen admitted, apparently without objection, the testimony of the husband that he did not have access to the wife.
In 1924 the House of Lords reaffirmed the old English rule, so called, in the celebrated and fully-argued case of Russell v.Russell (1924), App. Cas. 687; 13 British Ruling Cases 246.
Evidently Mr. Justice Swayze was referring to section 5 of our Evidence act, which reads as follows: *Page 214 
"In any trial or inquiry in any suit, action or proceeding in any court, or before any person or committee having by law or consent of parties authority to examine witnesses or hear evidence, the husband or wife of any person interested therein as a party or otherwise shall be competent and compellable to give evidence the same as other witnesses, on behalf of any party to such suit, action or proceeding; provided, that nothing herein shall render any husband or wife competent or compellable to give evidence for or against the other in any action for criminal conversation, except to prove the fact of marriage, or to render any husband or wife competent or compellable to give evidence against the other in any criminal action or proceeding, except to prove the fact of marriage, and except as now otherwise provided by statute, or compellable in any action or proceeding for divorce on account of adultery to give evidence for the other, except to prove the fact of marriage, nor shall any husband or wife be compellable to disclose any confidential communication made by one to the other during the marriage."
In Russell v. Russell, supra, the Earl of Birkenhead, Viscount Finlay and Lord Dunedin, with Lords Sumner and Carson dissenting, reversed the court below, the court of appeal, which, in turn, had sustained the trial court, and decided that the evidence of the husband of non-access was not admissible in a divorce case. When the case got to the House of Lords the sole question argued and decided was whether such evidence was admissible, not only in legitimacy proceedings, properly so called, but also in divorce cases.
The English Evidence act of 1869, which is comparable to section 5 of our Evidence act, reads as follows:
"The parties to any proceeding instituted in consequence of adultery, and the husbands and wives of such parties, shall be competent to give evidence in such proceedings, provided that no witness in any proceeding, whether a party to the suit or not, shall be liable to be asked or bound to answer any question tending to say that he or she has been guilty of adultery, unless such witness shall have already given evidence in the same proceeding in disproof of his or her alleged adultery."
In Russell v. Russell, as in the case sub judice, the charge was adultery with a man unknown, in consequence of which adultery the wife gave birth to a child of which the husband declared he was not the father. The husband gave evidence of non-access, which was admitted in the trial court. The *Page 215 
master of the rolls held that the Evidence act of 1869 made husband and wife competent witnesses on any matter which was relevant to the issue to be tried, that issue being whether the respondent had committed adultery. The court of appeal based its decision on the effect of this Evidence act of 1869. Birkenhead stated that because of this act of 1869 "witnesses have indeed become competent but still they may not give this evidence."
Counsel called attention to the fact, ad hominem, that in an undefended case which Birkenhead had tried at nisi prius he had admitted evidence of non-access, bastardy the issue, given by a soldier petitioner. To which Birkenhead answered: "The matter was not argued, so that my attention was not directed to the point. With argument I am sure I should have reached my present conclusion."
Part of Lord Carson's vigorous dissent follows:
"My lords, I agree with the learned judge who tried this case, with the court of appeal where three learned judges were unanimous, and with my noble and learned friend Lord Sumner, that the evidence of the respondent was admissible on the issue of adultery to prove non-access or non-connection with the wife of the appellant. It is a remarkable fact that so far as the reports show no attempt to apply the rule has ever been made in the fifty-five years that have elapsed since the passing of the act in the trial of such issues as adultery, condonation, custody of children, c."
Lord Carson called attention to the rationale of the rule, namely, that a husband or wife should not be allowed to bastardize issue of the wife born during the marriage. And then he caustically asked these questions: "Would the evidence be admissible if no child had been born but the mother had a miscarriage which would equally prove adultery? If a woman confessed `I commited adultery with A.B., when my husband was abroad,' would the admissibility of this confession depend on whether a child was born or not; and, would the husband be able to give such evidence on an issue of adultery in the one event and not in the other?" And he adds: "To what an extremity would the rejection of this *Page 216 
evidence in the present case reduce the law of England! Here is a husband who knows, and who has proved to the satisfaction of a jury that he has not had access or connection with the wife and that his wife therefore must be guilty of adultery, and he is to be informed that the law of England gives him no relief and binds him to his adulterous wife, because he is not allowed to give evidence which he alone is capable of giving." Lord Carson did not discuss the act of 1869, expressing himself as entirely sure without that.
Dean Wigmore, writing in 1904 (3 Wigmore on Evidence §§2063, 2064), fell upon the rule lustily. He reviewed the English cases and examined the reasons alleged as the basis for the rule; and he contended that "the rule has no support in the established facts and policies of our law; there never was any true precedent for the rule and there is just as little reason of policy to maintain it." Later, in 1910 (Wigmore Pocket Code ofEvidence § 397), he wrote: "This rule is law in almost every state. The rule is due to an historical blunder and is senseless in policy."
The parties were married August 16th, 1920, in Moorhead, Minnesota, and lived together in Fargo, North Dakota, until the husband had completed his education as a chemist, the war having interrupted his studies. He went to Detroit, Michigan, by agreement with his wife, and remained there about one year. Then he went to Brooklyn, New York, to take a position, but the wife did not come east with him. He went to Brooklyn the latter part of June, 1928, then to Stamford, Connecticut, where he lived for two or three months; and then he went to live at 240 Harrison avenue, Jersey City, in this state, where he has since lived.
While the wife consented to the husband living in Brooklyn, she did not come to Brooklyn with him; she wanted to stay where she was in the west, and work for another year. The husband testified that his wife wanted him to go to Chicago and work there, adding that she would not come east.
The wife went to Brooklyn in 1928, and the husband said he expected she would stay there with him; and he had sent her money especially for that purpose, but that she would not *Page 217 
stay in Brooklyn and still wanted him to go to Chicago, stating that she had a position there, that he could get a position there, and that they would be better off in Chicago. At this time the husband was working as a chemist with a large corporation in Brookyln. The wife stayed in Brooklyn four days, and when she left said nothing definite about coming back to Brooklyn.
The parties stayed at the Plaza Hotel, Jersey City, in the second week of June, 1929. The husband testified that he had sent money to the wife at this time that she might come on and make a home here. They remained at the Plaza Hotel only one day and a night; then the wife stated that she was not going to stay, that she was going back to Chicago. She testified that while she was in Jersey City on this occasion they looked at a number of apartments as possible homes.
The first bill of particulars, supplied by the wife, gives the times of intercourse with the husband as Thanksgiving time, 1928, "March, 1929," and June, 1929, and the place, the Plaza Hotel, Jersey City. The second bill of particulars gives the times as Thanksgiving time, 1928, "the last week in March, 1929," and June 15th to 20th, 1929, and the place, the Plaza Hotel, Jersey City.
On the trial the wife withdrew the statement that there had been intercourse in March, 1929, so that left the times, as given by her, as Thanksgiving, 1928, and June, 1929. The wife was delivered of a child weighing nine pounds in Chicago, Illinois, on December 9th, 1929. The bills of particulars were offered and were received, subject to the objection of the wife; and they were received expressly "to be limited to their proper scope and uses."
Depositions were taken of physicians in Minneapolis, Minnesota, and Chicago, Illinois. One physician in Minneapolis examined the wife on January 2d 1929. He stated that she was then pregnant three and a half months. A physician in Chicago examined her in the middle of January, 1929, and again in the middle of May, 1929, at which later time he thought she was three or four months pregnant. Another physician in Chicago examined the wife on May 14th, 1929, *Page 218 
and thought that she was then three months pregnant. He delivered her of the child on December 9th, 1929, and testified that the child was not premature. An expert obstetrician testified that the child could not have been conceived in September, 1928, or in November, 1928; and further, that a child of nine pounds was not a premature child; that such a child could not have been conceived the second week of June, 1929, and born December 9th, 1929.
Apparently the conception that resulted in the birth took place in March, 1929. But the wife testified that she did not see the husband between November, 1928, and June, 1929, and he so testified. The husband said that when they met in June, 1929, she told him she expected a baby in July or August, "that it was a case of delayed birth," and he added "she did not look to be pregnant." The wife testified "there is nothing strange about the fact I did not show pregnancy, I did not show it two weeks before the baby came."
But the bills of particulars may not be used as admissions, nor may the wife's testimony nor the husband's testimony, which testimony was taken over the wife's objections, be used in deciding this case. And without using the bills of particulars or the testimony of the wife or the testimony of the husband there is no proof of adultery. If the bills of particulars or the testimony of the wife or the testimony of the husband could be used, then the testimony of the physicians might furnish corroboration.
Following the declaration in Palmer v. Palmer, supra, of the rule to be applied, I advise a decree dismissing the husband's petition; but conceivably, proof of the facts may come from others than the husband or the wife later and be available, so that the husband's petition will be dismissed without prejudice.
As to the wife's counter-claim for maintenance and adultery: The wife now lives in Chicago. She testified that when she came to Jersey City in June, 1929, she came with the idea of taking an apartment, but added that the husband was not fair and square because he was looking at apartments far beyond his income, and "we had a grand row." The husband *Page 219 
testified she then said, "there is no use, I will go back to Chicago." She testified the last time she received money from her husband she received $75 to come to New York from Chicago, in January, 1928; that she supported herself and averaged about $35 a week during the year before the trial. In a letter to the husband she stated: "Once a year I will come and live with you for a day, never permanently."
It is quite apparent that the husband did not unjustifiably abandon the wife, nor neglect nor refuse to support her. She chose to live in the west. He made efforts to establish a home in the east, where his work was; but she preferred to remain in the west where she had employment and interests. The wife made no claim for maintenance until she filed her counter-claim. Apparently if the husband had not filed his petition for divorce she would not have applied for maintenance. There is no proof of adultery by the husband.
I advise a decree dismissing the wife's counter-claim for maintenance and adultery. *Page 220